**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lynn G. Rubenstein,                            )<br>                                                          )<br>               Plaintiff,                           )<br>                                                          )<br>vs.                                                      )<br>                                                          )<br>Michael J. Astrue, Commissioner of Social )<br>Security,                                             )<br>                                                          )<br>               Defendant.                        )<br>_____)  | No. CV 11-02457-PHX-NVW<br><br>**ORDER** |

Plaintiff Lynn G. Rubenstein seeks review under 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security ("the Commissioner"), which denied her disability insurance benefits and supplemental security income under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. Because the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence and is based on legal error, the Commissioner's decision will be vacated and the case remanded for further administrative proceedings.

**I.     Background**

    **A.     Factual Background**

Rubenstein was born in July 1980 and was 30 years old at the time of the administrative hearing. She completed two years of college and served as a public relations intern for a news and media office. She worked as a business development manager for a technology training company for four years, earning $55,000 in 2004, but

left that job to move closer to her parents because her father was in poor health. She obtained a real estate license and worked as a realtor until March 2007.

In July 2006, Rubenstein was treated for back pain and also reported dizzy spells, eye pain, and persistent nausea. In December 2006, when she was eight months pregnant, Rubenstein fell down stairs and injured her tailbone. Subsequently, she developed chronic migraine headaches and occipital neuralgia (sharp pain around her eyes). She quit taking new real estate clients then and in March 2007 completely quit working.

Rubenstein sought treatment for tailbone pain on July 21, 2008. X-rays of her lower back showed significant degenerative changes at L5-S1, but no tailbone fracture. On July 21, 2008, she denied having headaches. She received medication and osteopathic manipulation therapy to treat her back.

On October 21, 2008, Rubenstein was treated by her primary care provider, Anthony Will, D.O. She reported having dizziness, nausea, and vertigo since the previous day. Dr. Will noted, "Associated with migraines, left arm tingling." On November 3, 2008, Dr. Will treated Rubenstein for low back pain and noted "no headache, no head trauma" under "Review of Systems." On November 24, 2008, Dr. Will treated Rubenstein for back pain, but reported improved range of motion and activities of daily living with osteopathic manipulation therapy. Dr. Will noted that she had no new complaints of migraine headache, migraines had decreased since osteopathic manipulation therapy, and there had been a decrease in the frequency, duration, and intensity of headaches. On December 9, 2008, Rubenstein saw Dr. Will regarding chest pain.

On January 5, 2009, Rubenstein saw Dr. Will for diffuse musculoskeletal pain. She reported that she had fallen on her tailbone again a week before the visit. Dr. Will noted that she was "experiencing cervical thoracic and lumbar pain with mild headaches." But he also wrote under "Review of Systems" that she had "no headache, no head trauma."

1   On February 6, 2009, Rubenstein saw Dr. Will for cervical, thoracic, lumbar pain.
2   He wrote, "Patient states osteopathic care is decreasing her pain, increasing range of
3   motion activities of daily living." Under "Review of Systems," he again wrote "no
4   headache, no head trauma."

5   On February 9, 2009, Rubenstein saw Dr. Will for "a flareup of her cervical
6   thoracic and lumbar region pain status post picking weeds in her yard." He wrote,
7   "Patient does remark that osteopathic care significantly decreasing her pain, increasing
8   her range of motion and activities of daily living." Under "Review of Systems," he again
9   wrote "no headache, no head trauma."

10   On March 20, 2009, Rubenstein saw Dr. Will for "diffuse arthritis/musculoskeletal
11  pain in the cervical, thoracic, lumbar region and all extremities." He wrote:

> Pain is present all day long and is decreased with rest and is worse with activity. Pt reports increased range of motion, increased activities of daily living, and better quality of life with current treatment plan. Character of the pain is described as dull. Onset of pain has been present for many years. Patient admits to associated symptom of myalgia and arthralgia.

15  Under "Review of Systems," he again wrote "no headache, no head trauma."

16  On April 17, 2009, Rubenstein saw Dr. Will for "diffuse cervical thoracic and
17  lumbar pain." Under "Review of Systems," he wrote "no headache, no head trauma"
18  again.

19  On July 13, 2009, Rubenstein saw Christine Estrada, D.O., a doctor in the same
20  clinic as Dr. Will. Dr. Estrada noted Rubenstein reported multiple problems, including
21  blood in the stool following cramping, diarrhea, and nausea; chest pain; and grief,
22  depressed moods, and anxious feelings approaching the one-year anniversary of her
23  father's death. Dr. Estrada also wrote:

> She [complains of] frequent headaches for the past 15 months "right behind both eyes." These headaches began when she was pregnant with son and have remained with her since then. They occur daily, and she describes them as moderate to severe. She states that she sees "floaters" preceding the headache, and [] during the headache, she is sensitive to light and sound. She finds relief in a quiet, dark room. She used to take acetaminophen for these headaches, which no longer work[s].

1    On July 23, 2009, Rubenstein saw Dr. Will for "follow up." She reported painful
2 sinus pressure, increased pain when she moved her eyeballs, and pain in the cervical
3 thoracic region. He diagnosed her as having acute sinusitis and prescribed an antibiotic
4 and an expectorant.

5    On July 28, 2009, Rubenstein saw Dr. Will for "follow up migraines." She
6 reported a decreased, mild headache and continued cervical thoracic pain.

7    On August 17, 2009, Rubenstein saw Dr. Will for "headache with cervical and
8 thoracic pain" with a chief complaint of chronic migraine headaches." He wrote:

> Patient notes that the migraines have been present for a long time. The pain is moderate and localized to the frontal occipital region of the head. Sometimes the pain is unilateral in nature. Patient admits to sensitivity to light and sound. Patient also admits to associated nausea. Patient states the pain is worse with motion and activity. Pain is improved with rest and lying down in a dark room. Patient is currently taking migraine medications which help relieve the pain. Patient states that osteopathic care is decreasing [her] pain, and increased range of motion, while improving quality of life. . . . Patient states that today's pain is achy and sharp.

14 Dr. Will noted that Rubenstein "is pending a neurology consultation" and had previously
15 had a negative CT scan. Again, he wrote "no headache, no head trauma" under "Review
16 of Systems." He prescribed amitriptyline to be taken daily and butalbital to be taken as
17 needed.

18    On August 20, 2009, Rubenstein saw Dr. Will for a follow up appointment for
19 migraine headaches. She indicated that she had pain in the right greater occipital nerve
20 distribution, had done some internet research regarding headaches, and had made an
21 appointment with a headache specialist.

22    On September 17, 2009, Rubenstein saw neurologist Eric J. Eross, D.O., Director
23 of the Scottsdale Headache Center at Arizona Neurological Institute, a fellowship-trained
24 headache medicine specialist. Dr. Eross wrote that Rubenstein reported having suffered
25 from migraines for the past two and a half years and that they had gotten worse the last
26 year and a half. Her headaches were associated with light and sound and accompanied
27 with nausea. She also reported that the amitriptyline had helped. Dr. Eross increased

1  Rubenstein's amitriptyline prescription and prescribed a trial of Axert for acute
2  management of migraine headache.

3        On September 17, 2009, Rubenstein also saw Dr. Will to receive a bilateral
4  occipital nerve block, *i.e.*, injections of lidocaine in her neck.  On September 21, 2009,
5  she returned to Dr. Will for another round of bilateral occipital nerve blocks.  She
6  reported that treatment decreased her head pain, but the onset of pain was unpredictable.
7  She also reported diffuse cervical thoracic and lumbar region pain.

8        On September 24, 2009, Rubenstein returned to Dr. Eross.  She reported that the
9  most recent occipital nerve blocks had been effective only on the left side and she had
10 pain on the right side of her head.  The areas over both her right and left greater occipital
11 nerves were tender to palpation.  Dr. Eross further increased Rubenstein's amitriptyline
12 prescription and performed a right-sided greater and lesser occipital nerve block.

13       On October 12, 2009, Rubenstein saw Dr. Eross again.  Her episodic migraine had
14 improved although she had an adverse reaction to two of the pain medications.  He
15 recommended that she continue taking amitriptyline, continue osteopathic manipulation,
16 not repeat the occipital nerve blocks, try a lidocaine nasal spray for acute management of
17 headaches, and begin an oral birth control pill to reduce headaches associated with her
18 menstrual period and ovulation.  On that day, she rated her pain as 0.

19       On October 15, 2009, Rubenstein saw Dr. Will, who prescribed the oral birth
20 control pill recommended by Dr. Eross.  On November 2, 2009, she received osteopathic
21 manipulation therapy from Dr. Will for her head and back.

22       On November 5, 2009, Rubenstein saw Dr. Eross for increased head pain.  He
23 diagnosed it as a flare-up of bilateral occipital neuralgia, possible underlying cervicogenic
24 headache, chronic migraine, and possible medication side effects.  He performed bilateral
25 occipital nerve blocks.  He prescribed Topamax to replace the amitriptyline and
26 recommended that she see a pain specialist for possible C2-C3 medial nerve branch
27 blocks.
28

1    On November 6, 2009, Rubenstein was treated by Dr. Will for persistent
2 headaches. She reported progressive headaches and some lateral visual field impairment.
3 Dr. Will ordered an MRI of her brain, which was conducted on November 11, 2009, and
4 did not identify a problem.

5    On November 11, 2009, Rubenstein also began treatment with Stanley E. Farrell,
6 D.D.S., Diplomate, American Board of Orofacil Pain, a temporomandibular joint
7 ("TMJ") specialist. For about a year, she wore a splint for her jaw and received nerve
8 block injections in her jaw.

9    On November 13, 2009, Rubenstein was treated again by Dr. Will. His notes state
10 that her chief complaint is headaches, but also "no headache, no head trauma" under
11 "Review of Systems."

12    On November 25, 2009, Rubenstein saw Patrick Hogan, D.O., of Arizona Pain
13 Specialists. On that day, she rated her pain as 2 out of 10. She described stabbing pain
14 behind her eyes as well as some stabbing pain into her occipital region. She also
15 described her pain as throbbing, shooting, stabbing, sharp, and continuous.

16    On December 4, 2009, Rubenstein completed a function report. She said that pain
17 and sensitivity to light interferes with her sleep, driving, reading, memory, concentration,
18 and many daily activities. She said that she is able to dress, bathe, and handle her own
19 personal care, but needs assistance with caring for her children. She used to cook meals
20 from scratch; now she reheats already cooked food. She does household chores as much
21 as possible, which usually is limited laundry and small clean-ups. She shops for groceries
22 and other items by computer. She usually does not go out of the house except for medical
23 appointments and to dinner with her husband every two weeks. She said she has pain
24 every day, but the degree of pain varies from 2 to 3 (on a scale of 1-10) on a good day to
25 8 to 10 on a bad day.

26

27    Rubenstein is married with two young children, who were three and four years old
28 at the time of the administrative hearing. After she began having head and back pain, her

1  mother lived with Rubenstein and her family for nine months to take care of the children.
2  After that, her husband's parents began coming to Rubenstein's house everyday to help
3  while her husband is at work. Because her pain varies, she is hesitant to be alone with the
4  children, but when she can, she heats food for them, plays with them, changes diapers,
5  and puts dishes in the dishwasher. Rubenstein quit driving about March 2007.

6  Rubenstein's last date insured is December 31, 2009.

### B. Procedural History

On November 12, 2009, Rubenstein protectively applied for disability insurance benefits and supplemental security income. She alleged disability beginning March 20, 2007. On May 9, 2011, she appeared with her attorney and testified at a hearing before the ALJ. A vocational expert also testified.

On May 16, 2011, the ALJ issued a decision that Rubenstein was not disabled within the meaning of the Social Security Act. The Appeals Council denied Rubenstein's request for review of the hearing decision, making the ALJ's decision the Commissioner's final decision. On December 12, 2011, Rubenstein sought review by this Court.

## II. Standard of Review

The district court reviews only those issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is more than a scintilla, less than a preponderance, and relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* In determining whether substantial evidence supports a decision, the court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.* As a general rule, "[w]here the evidence is susceptible to more than one rational

interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

The ALJ is responsible for resolving conflicts in medical testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). In reviewing the ALJ's reasoning, the court is "not deprived of [its] faculties for drawing specific and legitimate inferences from the ALJ's opinion." *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

**III.   Analysis**

    **A.   The ALJ Erred in Weighing Medical Source Evidence.**

        **1.   Legal Standard**

In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians:  (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight should be given to the opinion of a treating physician than to the opinions of non-treating physicians. *Id.* A treating physician's opinion is afforded great weight because such physicians are "employed to cure and [have] a greater opportunity to observe and know the patient as an individual." *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons, and where it is contradicted, it may not be rejected without "specific and legitimate reasons" supported by substantial evidence in the record. *Lester,* 81 F.3d at 830. Moreover, the Commissioner must give weight to the treating physician's subjective judgments in addition to his clinical findings and interpretation of test results. *Id.* at 832-33.

Further, an examining physician's opinion generally must be given greater weight than that of a non-examining physician. *Id.* at 830. As with a treating physician, there must be clear and convincing reasons for rejecting the uncontradicted opinion of an

- 8 -

examining physician, and specific and legitimate reasons, supported by substantial evidence in the record, for rejecting an examining physician's contradicted opinion. *Id.* at 830-31.

The opinion of a non-examining physician is not itself substantial evidence that justifies the rejection of the opinion of either a treating physician or an examining physician. *Id.* at 831. "The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957. Factors that an ALJ may consider when evaluating any medical opinion include "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion." *Orn*, 495 F.3d at 631.

Moreover, Social Security Rules expressly require a treating source's opinion on an issue of a claimant's impairment be given *controlling* weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). If a treating source's opinion is not given controlling weight, the weight that it will be given is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, relevant evidence supporting the opinion, consistency with the record as a whole, the source's specialization, and other factors. *Id.*

Finding that a treating physician's opinion is not entitled to controlling weight does not mean that the opinion should be rejected:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527. . . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Orn*, 495 F.3d at 631-32 (quoting Social Security Ruling 96-2p). Where there is a conflict between the opinion of a treating physician and an examining physician, the ALJ may not reject the opinion of the treating physician without setting forth specific, legitimate reasons supported by substantial evidence in the record. *Id.* at 632.

### 2. Dr. Anthony Will, Primary Care Provider

Rubenstein began seeing treating physician Anthony Will, D.O., as her primary care provider in July 2006. She saw him again in September 2008 and then began seeing him consistently through the date of the hearing, May 9, 2011. On April 22, 2011, Dr. Will completed a Residual Functional Capacity assessment in which he stated that Rubenstein's medical condition causes frequent severe pain, frequent severe fatigue, and a severe inability to deal with stress. He stated that the medications he has prescribed for her cause drowsiness, nausea, impaired concentration, and irritability. He opined that during an average workday, due to pain and fatigue, Rubenstein's ability to maintain attention, concentration, persistence, and pace performing daily tasks would be interrupted continuously. He further opined that due to her medical condition, it is medically necessary for her to alternate between sitting and standing positions at will. He also stated that Rubenstein must recline 40 minutes at a time for a total of 3 hours during an 8-hour day. He also opined that it was his medical opinion that Rubenstein had been unable to sustain any type of full-time employment since March 20, 2007.

The ALJ provided the following explanation of her rejection of Dr. Will's opinion:

> The undersigned has considered the opinion of the treating physician and finds it unpersuasive. **Dr. Will opined the claimant is limited to reclining three hours per day.** This is not supported by the objective medical evidence or by the claimant's own statements, particularly regarding her activities of daily living. Moreover, the claimant testified that she lies down four to five hours per day, which exceeds Dr. Will's own restriction.

(Emphasis added.) Obviously, the ALJ misread the Residual Functional Capacity assessment form. Dr. Will did not opine that Rubenstein may not recline more than three hours per day. The form plainly asks for the minimum amount of time the patient must

- 10 -

recline, not the maximum. This is the ALJ's entire explanation for rejecting Dr. Will's opinion.

The Commissioner contends that Dr. Will's opinion was contradicted by state agency physicians Jacqueline Farwell, M.D., and Ernest Griffith, M.D., who reviewed the record and placed their signatures on forms, and Dr. Ruben Aguilara, an examining physician, who apparently did not have Rubenstein's medical records to review and was not able to opine as to whether her headaches imposed limitations on her ability to work. Even if the opinions of Drs. Farwell, Griffith, and Aguilera are considered to contradict Dr. Will's opinion, his opinion may not be rejected without "specific and legitimate reasons" supported by substantial evidence in the record, and the ALJ did not provide any legitimate reason for rejecting Dr. Will's opinion.

### 3.     Dr. Ruben Aguilera, Consultative Examiner

On February 5, 2010, Ruben Aguilera, M.D., examined Rubenstein. He is identified as being Board certified in internal medicine. Rubenstein's counsel provided the ALJ with evidence that on August 11, 2010, the Arizona Medical Board issued a Decree of Censure and placed Dr. Aguilera on probation for ten years for prescribing issues and failure to review patients' past medical records. The Board action was based on Dr. Aguilera's actions in 2007 through 2009.

Although Rubenstein's application for disability benefits did not mention depression or being suicidal, the Arizona Department of Economic Security identified her allegations as "depression, suicidal, chronic severe migraines and neuralgia." Dr. Aguilera circled "depression, suicidal," and wrote "denies."

Dr. Aguilera reported that Rubenstein "states that she has headaches every minute of every day and nothing that has ever been tried has ever helped her." He also reported, "The claimant states that she has nothing at all wrong with her physically."

Dr. Aguilera's report does not refer to any prior medical records or any review of any records. It includes several statements that imply that he has no actual knowledge of

- 11 -

any diagnosis made by any other physician, *e.g.*, "Apparently the neurologists that had been seeing her have been calling it migraine." The report further states:

> The patient was examined on 02/05/10; the diagnosis is headaches.
>
> From my assessment, do I feel the condition would impose limitation for the next twelve months? This is very hard for me to say actually and I will explain below. The patient should be able to lift occasionally 50 pounds, frequently 25 pounds. She should be able to stand and walk; there should be no limitations in her standing or walking physically. She does not use an assist device. She has no limitations in her sitting, no limitations in her seeing, hearing and speaking. She should be able to frequently climb down, stoop, kneel, crouch or crawl and no limitations in reaching, handling, fingering or feeling. She has some limitation working around heights and moving machinery because of distraction from her headache but there should be no limitations working around extremes in temperatures, around chemicals, dust, fumes, gases or excessive noise.
>
> **CONCLUSION:**
>
> This patient has no physical limitations. **Allegation is that of continuous severe headache which I have no way to physically assess.** I can see where continuous severe headache would keep a person from concentrating and would make it difficult for her to work based on that. However, physically this young woman is strong and has no weakness or any functional or any physical abnormality. From my point of view physically she should be able to do almost any job. **I think this is one where the neurologist is going to have to make this call.** Based on what I can see, she should be able to work.

(Emphasis added.) Plainly, Dr. Aguilera stated that he was unable to opine regarding Rubenstein's work limitations.

The ALJ stated that she did not rely heavily on Dr. Aguilera's opinion:

> Physical examination was largely unremarkable and Dr. Aguilera opined the claimant would have no physical limitations. However, Dr. Aguilera reserved his opinion regarding what limitations, if any, could result from the claimant's headache diagnosis and referred her to a neurologist. At hearing, the claimant's representative mentioned that Dr. Aguilera had been recently disciplined. However, the Arizona Medical Board website shows Dr. Aguilera received a Decree of Censure with practice restriction relating to prescription of narcotics. The undersigned find this is insufficient to minimize his medical opinion. Dr. Aguilera is not suspended or on active probation. Although the undersigned does not rely heavily on his opinion regarding the effects of the claimant's alleged headaches and Dr. Aguilera's recommendation that the claimant see a neurologist, he is still reliable as to his physical examination of the claimant in that she had no noted physical limitations and the undersigned finds him persuasive.

Thus, the ALJ was persuaded that Rubenstein had no physical limitations because Dr. Aguilera did not observe any, disregarded his opinion that a "continuous severe headache

would keep a person from concentrating and would make it difficult for her to work based on that," and ignored his conclusion that a neurologist should "make this call."

### 4. Weighing the Opinions of a Treating, an Examining, and Two Non-Examining Medical Sources

As previously concluded, the ALJ did not provide any legitimate reason for rejecting Dr. Will's opinion. It is not contradicted by Dr. Aguilera, who said he did not observe any physical limitation, but could not "make this call" regarding Rubenstein's ability to work. It is contradicted by two non-examining medical sources without explanation, but the opinion of a non-examining physician is not itself substantial evidence that justifies the rejection of the opinion of either a treating physician or an examining physician. *Lester,* 81 F.3d at 831.

As a treating medical source, Dr. Will's opinion on an issue of a claimant's impairment must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). Even if it were not given controlling weight, the weight that it will be given must be determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, relevant evidence supporting the opinion, consistency with the record as a whole, the source's specialization, and other factors. *Id.* Dr. Will treated Rubenstein frequently for more than two years before the administrative hearing. Although he is not a specialist, his opinion is consistent with the records of Dr. Eross, D.O., Director of the Scottsdale Headache Center at the Arizona Neurological Institute, a fellowship-trained headache medicine specialist; pain specialist Patrick Hogan, D.O.; and Stanley Farrell, D.D.S.

Although Rubenstein's degree of pain and medication side effects vary, there is evidence that she has significant pain daily. Dr. Will was asked to assess her ability to sustain work full-time on a regular and continuing basis, defined as 8 hours a day, 5 days a week, in a competitive environment. His opinion that Rubenstein's pain and fatigue

1  would continuously interfere with her ability to maintain attention, concentration,
2  persistence, and pace performing daily tasks should have been given substantial, if not
3  controlling, weight.  Dr. Will's opinion regarding the alleged onset date of disability,
4  however, should not be given controlling weight because the current record does not
5  support it with substantial evidence.

### B. The ALJ Erred in Weighing Lay Witness Evidence.

In additional to medical sources, the ALJ may consider evidence from spouses, parents, friends, and others regarding the severity of a claimant's impairment and how it affects her ability to work.  20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4).  Rubenstein's husband submitted a sworn affidavit stating that since early 2007 he has observed the effects of her chronic migraines, occipital neuralgia, severe tailbone pain, and pain medication:  difficulty reading, using the computer, operating a vehicle, and participating in normal ongoing communications; limited ability to concentrate and follow instruction; and difficulty to sit in one position more than a few minutes, which interferes with dedicating time to an activity and with sleep.  Rubenstein's husband's parents submitted a sworn affidavit stating that on weekdays they are with Rubenstein to assist her and her children and have observed the effects of her pain, including difficulty sitting, fatigue, lack of concentration, memory loss, blurred vision, shaking, and tremors.  Rubenstein's friend since 2006 also submitted a sworn affidavit stating that she had observed Rubenstein's chronic pain and fatigue.

Lay witness evidence is competent evidence and cannot be disregarded without providing specific reasons germane to each witness.  *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009).  The ALJ may not discredit lay testimony as not supported by medical evidence in the record.  *Id.* at 1116.   *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).

Here, the ALJ stated:

> The undersigned has considered the third party statements from the claimant's spouse, parents, and friend.  These statements are given less weight because they do not come from medical experts and because the

- 14 -

>totality of medical evidence does not support them. Moreover, the determination of disability is reserved to the Commissioner. Ex. 16E-18E.

The ALJ erred by discrediting the third party witness statements without providing specific reasons germane to each witness and by discrediting the statements as not supported by medical evidence in the record.

### C. The ALJ Erred in Evaluating Rubenstein's Credibility.

In evaluating the credibility of a claimant's testimony regarding subjective pain or other symptoms, the ALJ is required to engage in a two-step analysis: (1) determine whether the claimant presented objective medical evidence of an impairment that could reasonably be expected to produce some degree of the pain or other symptoms alleged; and, if so with no evidence of malingering, (2) reject the claimant's testimony about the severity of the symptoms only by giving specific, clear, and convincing reasons for the rejection. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).

Social Security Ruling 96-7p(4) provides:

>In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

The ALJ must consider factors relevant to a claimant's symptoms that include the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment other than medication; and any measures taken to relieve pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

During the administrative hearing, Rubenstein testified that she fell in December 2006 and hurt her tailbone. After that, she had difficulty sitting and began having migraine pain and occipital pain. She testified that she stopped working in March 2007

- 15 -

primarily because of the migraine pain and occipital pain although she continues to have low back pain. She said that she has pain every day, even with medication, but she never knows how severe the pain will be. She said that the nerve blocks injected into her jaw reduced the muscle spasms from her jaw to her head, but they had only short-term benefit. She testified that some of the occipital nerve blocks were successful for a week to a month, and some had no effect. She described the medications she takes daily and those she takes only if the pain is really bad. She said that some cause her to fall asleep and others cause her to vomit, but they do provide temporary relief. She described the adverse effects of Topamax on her memory and concentration. She testified that between 8:00 a.m. and 5:00 p.m. she typically lays down a total of 4 to 5 hours divided over 2 or 3 times a day. She described problems she has with sitting, standing, and walking because of low back pain. She also said that she gets temporary relief from back pain for 2 or 3 days from osteopathic manipulation therapy. She estimated that she would need to alternate sitting and standing every five to ten minutes.

The ALJ found that Rubenstein's medically determinable impairments could reasonably be expected to cause the alleged symptoms and did not make a finding of malingering. Then the ALJ found Rubenstein's statements regarding the intensity, persistence, and limiting effects of the symptoms not credible to the extent they are inconsistent with the ALJ's residual functional capacity assessment. In other words, the ALJ found Rubenstein's statements not credible to the extent she claims she is unable to perform sedentary work that permits her to sit or stand at will.

To support the credibility finding, the ALJ's hearing decision states:

> **The claimant alleged she is unable to work because of depression, because she is suicidal**, and because of chronic severe migraines and neuralgia. She alleged she is in constant pain, unable to see well, has trouble moving her eyes and has constant pain from headaches that is intensified by different types of light. She alleged the pain prevents her from doing even the basic things in life, including reading, watching television, taking care of her children, doing housework, or driving. She reported that all of the things that used to give [her] pleasure are now painful because of the chronic migraines and occipital neuralgia and that because she is photosensitive and noise-sensitive, going to a store is virtually out of the question, as is leaving the house most days. When

>
> 1  exposed to light, especially sun light, waves of stabbing, throbbing pain
>    starts in her eyes and radiates through her head. She alleged that
> 2  medications have not really helped and nothing prevents the migraines and
>    occipital neuralgia, though she admits the pain medication slightly helps. []
>
> . . . .
>
> . . . In February 2009, the claimant reported to her treating physician that
> she had been picking weeds in her yard and in March 2009 reported she was
> also experiencing increased range of motion, increased activities of daily
> living, and better quality of life under her current treatment plan. [] The
> treatment records also indicate the claimant was able to perform research on
> the internet regarding her condition and had decreased pain and increased
> quality of life as of September 21, 2009. []
>
> . . . .
>
> In sum, the evidence as a whole supports the residual functional capacity
> assessed by this decision. The claimant's subjective complaints are less
> than fully credible and the objective medical evidence does not support the
> alleged severity of symptoms. Although the claimant's activities of daily
> living were somewhat limited, some of the physical and mental abilities and
> social interactions required in order to perform these activities are the same
> as those necessary for obtaining and maintaining employment and are
> inconsistent with the presence of an incapacitating or debilitating condition.
> The claimant testified that she can prepare meals, lift her three year old son
> weighing 20 pounds, do laundry and wash dishes. The claimant's ability to
> participate in such activities undermined the credibility of the claimant's
> allegations of disabling functional limitations. **It is also worth noting that
> the claimant's testimony at hearing came as somewhat as a surprise.
> The claimant testified she initially stopped working due to pain
> resulting from a fall she suffered. However, there are no records in
> evidence regarding this alleged fall** or, for that matter, any records around
> her alleged onset date. Therefore, the undersigned finds the claimant has
> not been deprived of the ability to perform work subject to the residual
> functional capacity assessed by this decision for any 12-month period since
> the alleged onset date.

(Emphasis added.)

Although the ALJ stated specific reasons for finding Rubenstein's subjective symptom testimony lacked credibility, they are not clear and convincing because the ALJ misstated the record. The record shows that Rubenstein did not claim that she cannot work because she is depressed and suicidal. The record also shows that Rubenstein repeatedly complained of and received treatment for tailbone and low back pain and that she reported having fallen on her tailbone in December 2006. Moreover, at the hearing, Rubenstein did not claim that she stopped working because of the fall, but rather because after the fall, she developed head pain in addition to the tailbone pain.

- 17 -

1    Further, the record shows that Rubenstein's daily living activities are more than
2 "somewhat limited." Evidence that at times she can reheat food, put dishes into a
3 dishwasher, or use a computer does not support finding that she can function with
4 limitations on a regular and consistent basis. Rather, the record shows that her symptoms
5 fluctuate without predictability, which is consistent with her testimony.
6    Therefore, the ALJ erred by failing to state specific, clear, and convincing reasons
7 for finding Rubenstein's subjective symptom testimony less than fully credible.

### D. The ALJ's Determination that Rubenstein Can Perform Jobs that Exist in Significant Numbers in the National Economy Is Not Supported by Substantial Evidence.

10    As found above, the ALJ failed to provide adequate reasons for her weighing of
11 medical source and lay witness evidence and her assessment of the credibility of
12 Rubenstein's subjective symptom testimony. As a result, the residual functional capacity
13 assessment is not based on substantial evidence. *See Lingenfelter v. Astrue*, 504 F.3d
14 1028, 1040 (9th Cir. 2007) (substantial evidence did not support residual functional
15 capacity assessment where the ALJ did not provide clear and convincing reasons for
16 excluding the claimant's pain testimony).
17    The ALJ was required to assess Rubenstein's residual functional capacity, which is
18 her "*maximum* remaining ability to do sustained work activities in an ordinary work
19 setting on a **regular and continuing** basis." Social Security Ruling 96-8p (emphasis in
20 the original). "A 'regular and continuing basis' means 8 hours a day, для 5 days a week,
21 or an equivalent work schedule." *Id.* The ALJ determined that Rubenstein had the
22 residual functional capacity to perform:

> sedentary work as defined in 20 CFR 404.1567(a) with the following exceptions: can occasionally climb ramps or stairs; no climbing of ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, or crawl; limited to unskilled work; needs to avoid concentrated exposure to hazards; can sit or stand at will; must avoid concentrated exposure to extremes in temperature, humidity, and irritants such as fumes, odors, dust or gases.

1  If Rubenstein's subjective symptom testimony were fully credible, she would not have the
2  capacity to perform sustained work activities in an ordinary work setting on a regular and
3  continuing basis even if sedentary and with the identified limitations.

4  Further, the vocational expert's testimony responding to hypothetical questions
5  based on a flawed residual functional capacity assessment is not substantial evidence in
6  support of the ALJ's determination that Rubenstein is able to perform existing jobs.
7  *Lingenfelter*, 504 F.3d at 1041.  "If the assumptions in the hypothetical are not supported
8  by the record, the opinion of the vocational expert that claimant has a residual working
9  capacity has no evidentiary value."  *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir.
10 1984).  Thus, the vocational expert's testimony that Rubenstein could perform
11 receptionist and telemarketing representative jobs is not substantial evidence because the
12 assumptions on which it is based are not supported by the record.

13 Moreover, the vocational expert testified that a hypothetical individual with the
14 same age, education, and work experience as Rubenstein who had the same limitations
15 due to pain and fatigue that she testified to would not be able to perform full-time work of
16 any kind.  The vocational expert also testified that even less restrictive limitations, *i.e.*,
17 must recline during the day for two hours or would miss work more than three times a
18 month, would preclude all work.

19 Therefore, the ALJ's residual functional capacity assessment and determination
20 that Rubenstein is able to perform work that exists in significant numbers in the national
21 economy are not supported by substantial evidence.

22 **E.  Further Administrative Proceedings Are Warranted.**

23 If the ALJ's decision is not supported by substantial evidence or suffers from legal
24 error, the court has discretion to reverse and remand either for an award of benefits or for
25 further administrative proceedings.  *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir.
26 1996); *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  "Remand for further
27 proceedings is appropriate if enhancement of the record would be useful."  *Benecke v.*
28 *Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).  "Conversely, where the record has been

1 developed fully and further administrative proceedings would serve no useful purpose,
2 the district court should remand for an immediate award of benefits." *Id.* (citing *Smolen*,
3 80 F.3d at 1292).

4 The record here does not provide substantial evidence of the alleged onset of
5 disability date of March 20, 2007.  There is a gap in treatment records from July 2006 to
6 July 2008, and Dr. Will's treatment notes are internally conflicting regarding whether and
7 when Rubenstein had headaches and to what extent treatment was effective for her head
8 and/or back pain.  At one point, Rubenstein reported that she had moderate pain for the
9 first year and severe pain for the following year and a half.  Although it is understandable
10 that she may have difficulty pinpointing when her pain progressed from moderate to
11 severe, especially when the level of severity is not constant from day to day and
12 medication affects her memory, the Court may not arbitrarily pick an onset date of
13 disability without substantial evidence in the record.

14 IT IS THEREFORE ORDERED that the final decision of the Commissioner of
15 Social Security is vacated and this case is remanded for further administrative
16 proceedings.  The Clerk shall enter judgment accordingly and shall terminate this case.

17 DATED this 28th day of August, 2012.

_____
Neil V. Wake
United States District Judge